**UNITED STATES of America, Plaintiff,**

v.

**Olivia Jeanne BOWEN, et al., Defendants.**

**No. S1 07 Cr. 961(LBS).**

United States District Court, S.D. New York.

Feb. 17, 2010.

---

2. Because the defendant is immune from this suit, it is unnecessary to reach any alternative argument for dismissal.

Preet Bharara, United States Attorney, Southern District of New York, by: Jenna M. Dabbs, Nicole W. Friedlander, Howard S. Master, Ryan P. Poscablo, Assistant United States Attorneys, for United States of America.

Eric Mark Sears, Law Office of Eric Sears, P.C., Leonard Fessenden Joy, Federal Defenders of New York Inc., New York, NY, for Olivia Jeanne Bowen.

Eugene J. Riccio, John R. Gulash & Eugene J. Riccio, Law Offices, Bridgeport, CT, Frederick H. Cohen, Roger Lee Stavis, Gallet Dreyer & Berkey LLP, Dov Berger, Gallet Dreyer & Berkey LLP, New York, NY, for Noemi Dodakian.

Joel M. Stein, Esq., New York, NY, for Robert Ingram.

Seth Ginsberg, New York, NY, for Chong Shing Wu.

## *OPINION*

SAND, District Judge.

On September 8, 2008, the Government filed the First Superseding Indictment (the "Indictment") against Defendants Olivia Jeanne Bowen ("Bowen"), Noemi Dodakian ("Dodakian"), David Norman ("Norman"), Robert Ingram ("Ingram"), and Chong Shin Wu ("Wu"). The Indictment charges two counts of conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. Defendants are alleged to have participated in two interrelated fraud schemes. Bowen, Dodakian, and Norman are charged in Count One. Bowen, Dodakian, Ingram, and Wu are charged in Count Two. Both alleged conspiracies are "advance fee" schemes, a fraud through which victims are induced to pay money to someone in anticipation of receiving something of greater value but receive little or nothing in return. The Indictment alleges that victims were induced to invest in the Count One and Count Two conspiracies with the promise of high returns on their investments in a short period of time. The Count One conspiracy purported to offer investors the opportunity to realize proceeds from a profitable investment account allegedly held with the World Bank in a foreign country. The Count Two conspiracy purported to offer investors the opportunity to invest in profitable notes issued by the Federal Reserve abroad. Both conspiracies are alleged to have informed the investors that proceeds from the notes could only be repatriated once fees and expenses incurred by the fund were paid. The Government alleges that none of the victims received the promised returns, and Defendants of both conspiracies used the victims' funds for personal expenses and sent funds to co-conspirators.

Currently before this Court are Defendants pretrial motions, in which (1) Dodakian and Ingram move to suppress the evidence obtained through the searches of their residences; (2) Dodakian, Ingram and Bowen move to suppress the evidence obtained through e-mail search warrants; and (3) Dodakian and Ingram move to sever the counts. For the following reasons, Defendants' motions are denied.

### I. Motions to Suppress

#### a. Residence Search Warrants

■ Ingram and Dodakian both move to suppress the evidence obtained through the searches of their residences, arguing that the Magistrate Judge lacked probable cause to issue the warrants. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Based upon a review of the affidavits, we find that each search warrant affidavit established probable cause for its respective search.[1]

■ The Zacher Affidavit provides ample evidence of probable cause to search Dodakian's residence. Dodakian is alleged to have received over $4.2 million in wire transfers. (Zacher Aff. ¶ 12.) The Zacher Affidavit alleges that Dodakian used substantial amounts of the funds obtained through the frauds for personal expenses. (Zacher Aff. ¶ 11.) The e-mail account Dodakian allegedly used to perpetrate the scheme was registered to the address at her residence. (Zacher Aff. ¶ 19.) Bank account statements dated in or about 2008 for bank accounts Dodakian used to perpetrate the scheme were mailed to her residence. (Zacher Aff. ¶ 19–d.) Special Agent Zacher reviewed the bank account statements and found that there were no paychecks or any other regular source of income deposited into the accounts. (Zacher Aff. ¶ 20.) The Zacher Affidavit also states that Dodakian "has not listed an office phone number or address, and has not indicated that she has regular employment, in communications with victims of the schemes." (Zacher Aff. ¶ 20.) Based on Special Agent Zacher's training and experience, the affidavit states that often times in frauds such as this one, document and materials used to perpetrate the fraud are found at the home. (Zacher Aff. ¶ 22.) Special Agent Zacher's expertise, coupled with the allegations that Dodakian used the money obtained from the fraud for personal expenses, used the residence as her address for her bank account and the e-mail account used to perpetrate the fraud, and did not use any other business address in perpetrating the frauds, demonstrates that the affidavit established probable cause.

■ The Irwin Affidavit, dated December 15, 2008, ("Irwin Aff. I") similarly establishes probable cause to search the Ingram residence. Ingram's principal challenge to the search warrant is that it fails to establish a nexus to the residence. "A showing of nexus does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir.2004) (internal citations and quotations omitted). The Irwin Affidavit states that the defendant "received over $7 million in wire transfers into his account" as a result of the fraud, and that "[e]ach of the co-conspirators used substantial amounts of the funds that had been wired in for personal expenses." (Irwin Aff. I ¶¶ 11–12.) We agree with the Government that,

---

1. Both Dodakian and Ingram object to the reliance placed on agent expertise. Contrary to Defendants' allegations, neither search warrant relied exclusively on agent expertise; rather, the expertise of the agents was one contributing factor. "[A]n agent's expert opinion is an important factor to be considered by the judge reviewing a warrant application." *United States v. Fama*, 758 F.2d 834, 838 (2d Cir.1985). In each affidavit, the agent identified numerous factors supporting a finding of probable cause. Therefore, we find nothing objectionable about the reliance placed on the expertise of the agents.

as a matter of common sense, there was, at a minimum, a "fair probability" that evidence of over $7 million in fraudulent proceeds, substantial portions of which were used for Ingram's personal expenses, would be found in Ingram's residence.[2] *See Gates,* 462 U.S. at 238, 103 S.Ct. 2317 (requiring a showing of "fair probability" to support a rinding of probable cause). The Irwin Affidavit also states that based on Special Agent Irwin's expertise and training, the home is often used in frauds such as these to maintain documents. (Irwin Aff. I ¶ 24.) Furthermore, the Irwin Affidavit states that Ingram e-mailed victims from "roberti42@earthlink.net," which appears to be a personal e-mail account. (Irwin Aff. I ¶ 16–d.) Based on the allegations of substantial use of the funds for personal expenses, the use of a personal e-mail address to perpetrate the fraud, and Special Agent Irwin's expert opinion that documents in frauds such as these are often kept at the home, we find

that there was probable cause to issue the search warrant.

Defendants' motions to dismiss the evidence obtained through the searches of the respective residences are denied.

### b. E-mail Search Warrants

Defendants Dodakian, Ingram, and Bowen move to suppress the results of the searches of their e-mail accounts on the grounds that the warrants authorizing those searches lacked sufficient particularity in describing the items to be seized, in violation of the Fourth Amendment. For the following reasons, Defendants' motions are denied.

■ The Fourth Amendment requires warrants to describe "the place to be searched, and the persons or things to be seized" with particularity.[3] U.S. CONST. amend. IV. A particularized warrant "prevents the seizure of one thing under a warrant describing another." *United States v. Buck,* 813 F.2d 588, 590–91 (2d

2. Ingram relies on *United States v. Gomez,* 652 F.Supp. 461 (E.D.N.Y.1987), in which the court found that government observation of gold jewelry in the defendant's home was not a sufficient nexus to justify searching the home. Yet, the court's reasoning was not that items purchased by the fruits of the crime could not provide a nexus; rather, the court held that "[a]lthough the presence of unexplained wealth can be probative of narcotics trafficking, . . . there is no indication here that the amount or value of the jewelry was substantial or in any way unusual. As such, it is [not] indicative of very much." *Gomez,* 652 F.Supp. at 463 (internal citations and quotations omitted). Thus, *Gomez* does not contradict a finding of probable cause in the instant case, in which there was a fair probability that evidence of the $7 million Ingram is alleged to have obtained through fraud might have been found in his residence, given that a substantial amount of that money was used for Ingram's personal expenses.

3. The Fourth Amendment's applicability to e-mail communications has been assumed by several courts in this Circuit, and we have not

been presented with sufficient reasons to depart from this understanding. *See United States v. McDarrah,* 2006 WL 1997638 (S.D.N.Y.2006) (analyzing a nearly identical e-mail search warrant to the warrant in the instant case under Fourth Amendment principles), *aff'd* 351 Fed.Appx. 558 (2d Cir.2009) (summary order); *United States v. Cioffi,* 668 F.Supp.2d 385, 390 n. 7 (E.D.N.Y.2009) (same) (*citing United States v. Zavala,* 541 F.3d 562, 577 (5th Cir.2008) ("[C]ell phones contain a wealth of private information, including emails, text messages, call histories, address books, and subscriber numbers. [The defendant] had a reasonable expectation of privacy regarding this information."); *United States v. Forrester,* 512 F.3d 500, 511 (9th Cir.2008) ("E-mail, like physical mail, has an outside address 'visible' to the third-party carriers that transmit it to its intended location, and also a package of content that the sender presumes will be read only by the intended recipient. The privacy interests in these two forms of communication are identical. The contents may deserve Fourth Amendment protection, but the address and size of the package do not.")).

Cir.1987). A warrant is sufficiently particular if it "enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize." *United States v. George*, 975 F.2d 72, 75 (2d Cir.1992). "As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Buck*, 813 F.2d at 590–91 (*quoting Marron v. United States*, 275 U.S. 192, 196, 48 S.Ct. 74, 72 L.Ed. 231 (1927)).

■ While there may be a degree of uncertainty as to the "precise applicability of the Fourth Amendment's particularity requirement with respect to searches of computer data," *United States v. McDarrah*, 05 Cr. 1182(PAC), 2006 WL 1997638, at *10 (S.D.N.Y. July 17, 2006) (*quoting Hensel v. Lussier*, 205 F.3d 1323, at *1 (2d Cir.2000) (summary order)), we reject Defendants' contention that the warrant lacked particularity because it failed to specify different or more precise computer search methods. "[I]t is generally left to the discretion of the executing officers to determine the details of how best to proceed with the performance of a search authorized by warrant." *Dalia v. United States*, 441 U.S. 238, 257, 99 S.Ct. 1682, 60 L.Ed.2d 177 (1979). Courts are ill-suited to constrain law enforcement to certain search-terms or methodologies in advance. As Judge Bianco recently noted, "in most instances, there is no way for law enforcement or the courts to know in advance how a criminal may label or code his computer files and/or documents which contain evidence of criminal activities." *United States v. Graziano*, 558 F.Supp.2d 304, 315 (E.D.N.Y.2008). To limit the government's computer search methodology *ex ante* would "give criminals the ability to evade law enforcement scrutiny simply by utilizing coded terms in their files or documents" or other creative data concealment techniques. *Id.* Accordingly, we join the *Graziano* court and several other federal courts[4] in holding that the Fourth Amendment does not require a search warrant to specify computer search methodology.[5] *See id.* at 315–16.

---

4. *See, e.g., United States v. Hill*, 459 F.3d 966, 978 (9th Cir.2006) ("[T]here is no case law holding that an officer *must* justify the lack of a search protocol in order to support issuance of the warrant.") (emphasis in original); *United States v. Brooks*, 427 F.3d 1246, 1251 (10th Cir.2005) ("At the outset, we disagree with [the defendant] that the government was required to describe its specific search methodology."); *United States v. Upham*, 168 F.3d 532, 537 (1st Cir.1999) ("The ... warrant did not prescribe methods of recovery or tests to be performed, but warrants rarely do so. The warrant process is primarily concerned with identifying *what* may be searched or seized— not how—and *whether* there is sufficient cause for the invasion of privacy thus entailed.") (emphasis in original); *United States v. Vilar*, No. 05 Cr. 621(KMK), 2007 WL 1075041, at *37 (S.D.N.Y. Apr. 4, 2007) (rejecting argument that a warrant must state with particularity how the computer will be searched) (collecting cases); *United States v. Lloyd*, No. 98 Cr. 529, 1998 WL 846822, at *3 (E.D.N.Y. Oct. 5, 1998) (same); *see also United States v. Sage*, No. 07–00006–01–CR–W–SOW, 2007 WL 4592074, at *11 (W.D.Mo. Dec. 27, 2007) ("[W]hile the issue has not been squarely addressed by the Eighth Circuit, courts in other circuits are essentially in agreement that a warrant 'need not specify how the computers will be searched.' " (*quoting Vilar*, 2007 WL 1075041, at *37)).

5. The Court notes that the Affidavit attached to the e-mail search warrant did explain the search methodology some degree. First, a copy of the contents of the target e-mail account (referred to as a "snapshot") would be taken from the internet service providers, and then the "snapshot" would be searched for the "items likely to be found" enumerated in paragraph twenty-two, including "communications between perpetrators of the fraudulent schemes described herein and the victims of the scheme ...." (*See* Irwin Aff. II ¶¶ 22–24.)

■ Nor does the Fourth Amendment require the executing authorities to delegate a pre-screening function to the internet service provider or to ascertain which e-mails are relevant before copies are obtained from the internet service provider for subsequent searching. *See United States v. Vilar,* No. 05 Cr. 621(KMK), 2007 WL 1075041, at *35 (S.D.N.Y. Apr. 4, 2007) (" '[I]t is frequently the case with computers that the normal sequence of 'search' and then selective 'seizure' is turned on its head,' as computer hardware is seized from a suspect's premises before its content is known and then searched at a later time." (*quoting In re Search of: 3817 W. West End, First Floor Chicago, Illinois 60621,* 321 F.Supp.2d 953, 958 (N.D.Ill.2004))). The Supreme Court has noted that, "[i]n searches for papers, it is certain that some innocuous documents will be examined, at least cursorily, in order to determine whether they are, in fact, among those papers authorized to be seized." *Andresen v. Maryland,* 427 U.S. 463, 482 n. 11, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). In a search of electronic documents such as e-mails, "the actual content of a computer file usually cannot be determined until it is opened with the appropriate application software on a computer" or until each file is analyzed by a program capable of searching the files for specific content. *United States v. Lamb,* 945 F.Supp. 441 (N.D.N.Y.1996). The Fourth Amendment's particularity requirement does not oblige the agents executing the warrant to conduct such a search to "identify the contents of computer files on [the internet service provider's] premises." *Id.; see also Vilar,* 2007 WL 1075041, at *35 ("[B]ecause of time restraints and insurmountable technical limitations, such searches cannot be carried out at the time the warrant is executed at the premises.").

An essentially identical warrant authorizing the search of "[a]ll stored electronic mail and other stored content information presently contained in, or on behalf of, the following electronic mail addresses: ps41 alum@aol.com" was upheld against an overbreadth/particularity challenge by Judge Crotty in *United States v. McDarrah,* 05 Cr. 1182(PAC), 2006 WL 1997638 (S.D.N.Y. July 17, 2006), and the Court of Appeals for the Second Circuit recently affirmed that judgment in a summary order on November 5, 2009. *United States v. McDarrah,* 351 Fed.Appx. 558 (2d Cir. 2009) (summary order). Judge Crotty reasoned that since the Affidavit extensively documented the continued use of the e-mail account in perpetrating the alleged crime of enticing a minor, there was probable cause to search the entire e-mail account for further evidence. Similarly, the affidavit in the instant case provided copious evidence of the use of the e-mail accounts to be searched in perpetrating the alleged crimes. (Irwin Aff. May 29, 2008 ("Irwin Aff. II").)

It is true that *United States v. Cioffi,* 668 F.Supp.2d 385 (E.D.N.Y.2009), which was issued two days before the Court of Appeals for the Second Circuit affirmed *McDarrah,* granted a motion to suppress when faced with a similar warrant authorizing the search of all e-mails in a defendant's e-mail account. Judge Block reasoned that since the affidavit did not limit the search to e-mails related to the alleged crime, and did not incorporate by reference the affidavit containing the description of the alleged crime and the associated use of the target e-mail account, the warrant lacked particularity. *See Cioffi,* 668 F.Supp.2d at 392 ("[A]uthorization to search for 'evidence of a crime,' that is to say, any crime, is so broad as to constitute a general warrant.... [A] *fortiori* a warrant not limited in scope to any crime at all is ... unconstitutionally broad." (*quoting United States v. George,* 975 F.2d 72, 77 (2d Cir.1992))).

However, *Cioffi* can be distinguished from the instant case on several factual grounds that make the "all records exception" [6] applicable here. The all records exception allows for the seizure of all of an enterprise's records when the enterprise is primarily engaged in unlawful activity and sufficient evidence is presented of the pervasiveness of that unlawful activity within the enterprise. *See United States Postal Serv. v. C.E.C. Servs.*, 869 F.2d 184, 187 (2d Cir.1989) ("When the criminal activity pervades that entire business, seizure of all records of the business is appropriate, and broad language used in warrants will not offend the particularity requirements."). In order to trigger the all records exception, "it is not necessary that the affidavit ... set forth specific factual evidence demonstrating that *every part* of the enterprise in question is engaged in fraud.... Rather, the affidavit need contain only sufficient factual evidence of fraudulent activity from which a magistrate could infer that those activities are just the tip of the iceberg." *United States v. Hernandez*, No. 09 Cr. 625(HB), 2010 WL 26544, at *10 (S.D.N.Y. Jan. 6, 2010) (*quoting United States v. Burke*, 718 F.Supp. 1130, 1140 (S.D.N.Y.1989)). "That evidence could consist of a large number of fraudulent transactions or of documentation—in the form of information gleaned from interviews with former employees or from undercover surveillance of the operation—that the entire operation is a scam." *Burke*, 718 F.Supp. at 1140.

Both such forms of evidence were presented in the Affidavit accompanying the e-mail search warrant, indicating that the described fraud was the "just the tip of the iceberg." *Id.* The Irwin Affidavit stated that the FBI had determined over the course of a more than two year investigation that the fraudulent scheme allegedly perpetrated by Defendants had "defrauded over 100 victims of more than $5 million." (Irwin Aff. II 9.) Additionally, Special Agent Irwin and a colleague had spoken with "over 50 victims of the schemes." (Irwin Aff. II 11.) The Affidavit then provided extensive excerpts of e-mails sent from the target accounts, which were given to the FBI by six unnamed victims. (Irwin Aff. II 15–27.) Based on the information in the Irwin Affidavit, there was clearly probable cause to find that "criminal activity permeate[d] much of the business" conducted by Defendants through the target e-mail accounts.[7] *United States v. Dinero Express, Inc.*, No. 99 Cr. 975, 2000

---

6. "The principle is not so much an 'exception' to the particularity requirement of the Fourth Amendment as a recognition that a warrant—no matter how broad—is, nonetheless, legitimate if its scope does not exceed the probable cause upon which it is based. The more extensive the probable wrongdoing, the greater the permissible breadth of the warrant." *United States v. Hickey*, 16 F.Supp.2d 223, 240 (E.D.N.Y.1998), *motion for reconsideration granted on other grounds, United States v. Hickey*, 16 F.Supp.2d 223 (E.D.N.Y.1998).

7. Moreover, the number of victims harmed by the alleged fraud (over 100) and the wide scope of the FBI's investigation as outlined in the Irwin Affidavit (interviews with over 50 victims, extensive e-mail excerpts from six victims) provide a factual scenario very much in line with previous applications of the all records exception. (Irwin Aff. II.) *See, e.g., United States v. Oloyede*, 982 F.2d 133, 140 (4th Cir.1992) ("[A]ffidavit presented documentation in over 50 cases ..., two confidential informants outlined in great detail the procedures associated with appellants' operation, and a review of 26 files disclosed that each file contained fraudulent documents."); *Nat'l City Trading Corp. v. United States*, 635 F.2d 1020, 1021–22 (2d Cir.1980) (affidavit listed 40 complaints about the enterprise, 20 of which had been investigated, and a pattern of conduct was identified by the investigator); *United States v. Brien*, 617 F.2d 299, 309 (1st Cir.1980) (warrant application listed 250 complaints about the enterprise, 75 of which were analyzed by the affiant, and the affiant interviewed 20 former employees).

WL 254012, at *10 (S.D.N.Y. Mar. 6, 2000). The fact that Defendants chose to use the same e-mail accounts for personal communications that they were simultaneously using to conduct their allegedly fraudulent business cannot insulate those e-mail accounts from a search pursuant to the all records exception, given these especially strong factors militating in favor of its application.

Because Defendants' alleged enterprise was primarily or solely criminal and Defendants used the target e-mail accounts as their primary e-mail accounts for conducting that business, the instant case is distinguishable from *Cioffi*. The defendant in *Cioffi* worked as a hedge fund manager at Bear Stearns Asset Management, and used at least two e-mail accounts when he allegedly perpetrated the crime of securities fraud: his work e-mail account, and his personal e-mail account. *Cioffi*, 668 F.Supp.2d at 387–89. Most of his business transactions were likely legal, and most of his business related e-mails, including those related to both licit and illicit business, were likely sent from his work e-mail address. For those reasons, the all records exception could not apply to validate the seizure of all e-mails in the personal e-mail account. *Cf. Burke*, 718 F.Supp. at 1140 (declining to apply the all records exception when evidence indicated that the enterprise was engaged in licit and illicit business transactions, and illicit transactions made up a small portion of total transactions); *Vilar*, 2007 WL 1075041, at *35 (refusing to apply all records exception when the defendant "entities managed approximately $1.2 billion in assets, and ... the Government [did] not contest that some portion of these assets, if not a substantial majority of them, were managed lawfully."). In contrast, in the instant case the Defendants' enterprise was so pervaded with criminal activity, and the target e-mail accounts were such essential instrumentalities of that enterprise,

that seizure of the entire account was appropriately authorized pursuant to the all records exception. (*See* Irwin Aff II.)

 Even were we to find that the warrant was overbroad or lacked particularity, the search would be saved by the "good faith" exception. *See United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); *Massachusetts v. Sheppard*, 468 U.S. 981, 988, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984) (applying exception to particularity requirement). The exception will protect against a suppression motion so long as the search was executed pursuant to the good faith reliance of the agents on a search warrant, unless the "warrant is so facially deficient ... that reliance upon it is unreasonable," *inter alia*. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir.2008) (internal citations and quotations omitted); *Leon*, 468 U.S. at 923, 104 S.Ct. 3405. In the e-mail search at issue, an executing agent would reasonably expect to seize a broad swath of e-mails in a case involving a multi-year, complex fraudulent scheme in which e-mail communications allegedly played a key role. *See Hernandez*, 2010 WL 26544, at *12 (applying good faith exception in the alternative to the all records exception because, "[g]iven the nature of a complex tax fraud case like this one, a government agent would likely expect to find fairly broad categories of tax-related documents to be seized.").

A nearly identical e-mail search warrant was found to qualify for the good faith exception in the alternative in *McDarrah* because "in a doubtful case, [courts] accord preference to the warrant." *McDarrah*, 2006 WL 1997638, at *10 (*quoting United States v. Irving*, 432 F.3d 401, 416 (2d Cir.2005)), *aff'd* 351 Fed.Appx. 558 (2d Cir. 2009) (summary order). Given that (i) "[t]he [Court of Appeals for the] Second Circuit has yet to comprehensively address

the unique issues raised by computer searches, and few district courts in this [C]ircuit have had occasion to address the topic," *Vilar*, 2007 WL 1075041, at *36, (ii) *McDarrah* had recently upheld a nearly identical warrant against a motion to suppress for lack of particularity at the time of the warrant's issuance, and (iii) the warrant application predated the *Cioffi* opinion by over a year, the executing agents were entitled to rely in good faith on the "objectively reasonable legal conclusions of [the] issuing judge." *United States v. Buck*, 813 F.2d 588, 592–93 (2d Cir.1987).

Accordingly, Defendants' motion to suppress the e-mail evidence is denied.[8]

## II. Motion to Sever

Federal Rule of Criminal Procedure 8(b) permits joinder of defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses. The defendant may be charged in one or more counts together or separately. All defendants need not be charged in each count." Fed.R.Crim.P. 8(b). We take "a common sense approach when considering the propriety of joinder under Rule 8(b)," *United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir.2003), and ask whether "a reasonable person would easily recognize the common factual elements that permit joinder." *United States v. Turoff*, 853 F.2d 1037, 1044 (2d Cir.1988). Even if joinder is proper under Rule 8, a court may still sever pursuant to Rule 14(a) if it appears joinder would prejudice a defendant or the government. *See* Fed. R.Crim.P. 14(a). "For reasons of economy, convenience and avoidance of delay, there is a preference in the federal system

for providing defendants who are indicted together with joint trials." *Feyrer*, 333 F.3d at 114.

■■■ Joinder is proper when the charged offenses are either (1) "unified by some substantial identity of facts or participants," or (2) "arise out of a common plan or scheme." *United States v. Attanasio*, 870 F.2d 809, 815 (2d Cir.1989). In the instant case, the overlap of facts between the two schemes is considerable. The conspiracies occurred at the same time—from early 2005 to the filing of the Indictment. Dodakian and Bowen participated in both the conspiracies. Victim 2 was a victim of both conspiracies. Ingram, a participant in the Count Two conspiracy, worked with Dodakian and Bowen and knew of Norman, the third named participant of the Count One conspiracy. Ingram told Victim 2 that if Victim 2 invested in the Count Two conspiracy, Ingram would pay out the returns due from the investment in the Count One conspiracy. (Indictment ¶ 6–b.) The two schemes had overlapping participants and victims, and the collaboration between the two conspiracies suggests a common scheme. Furthermore, the substantial identity of facts, as demonstrated by the common participants, the movement of victims across the schemes, and Ingram's knowledge of the existence and nature of the other scheme, makes joinder proper under Rule 8(b).

■■■ Additionally, we decline to use our discretion to sever under Rule 14. The Supreme Court of the United States has held that "when defendants properly have been joined under Rule 8(b), a district court should grant a severance under Rule 14 only if there is a serious risk that

---

8. At oral argument on these motions, counsel for Defendant Dodakian alluded to the fact that the Government has agreed to return some of the materials seized from Dodakian's residence, but has not yet returned them. (T.

at 23.) The Court does not address this issue at this juncture, as no motion pursuant to Federal Rule of Criminal Procedure 41(g) has been made.

a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993). "[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Id.* at 540, 113 S.Ct. 933. Dodakian alleges that prejudice will result from a joint trial because "a jury will be hard pressed to distinguish the evidence and apply it to each of the separate and distinct conspiracies to reach a fair verdict." (Dodakian Mem. 15.) However, Rule 8 authorizes a certain degree of prejudice. *See United States v. Lane,* 474 U.S. 438, 449 n. 12, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986) ("[T]he express language of Rule 14, as well as the Advisory Committee Note, shows that Congress tolerates some Rule 8 joinders even when there is prejudice."). The Court cannot discern any prejudice to Defendants, beyond the usual prejudice anticipated by Rule 8, which would result from proceeding on the Indictment. Furthermore, any risk of prejudice can be addressed through proper jury instructions. Defendants' motion to sever is denied.

### III. Conclusion

Defendants' motions to suppress the evidence obtained through searches of their residences are denied. Defendants' motions to suppress evidence obtained through e-mail searches are denied. Defendants' motion to sever is denied.

**SO ORDERED.**