**UNITED STATES of America**

v.

**Yanokura FELIZ, Defendant.**

**Criminal No. 98–2–P–C.**

United States District Court,
D. Maine.

June 10, 1998.

---

Jonathan R. Chapman, AUSA, Portland, Maine, for the government.

Philip Desfosses, Portsmouth, NH, Michael W. Mullane, Portland, Maine, for defendant Yanokura Feliz.

## MEMORANDUM OF DECISION AND ORDER

GENE CARTER, District Judge.

On January 21, 1998, a federal grand jury indicted Defendant Yanokura Feliz for possession of cocaine with intent to distribute under 21 U.S.C. § 841(a)(1). *See* Indictment (Docket No. 5). Now before the Court is Defendant's Motion to Suppress Evidence and Incorporated Memorandum of Law (Docket No. 7). After an initial round of briefing on the motion, the parties agreed to narrow the areas of dispute to two legal issues: (1) whether the issuing judge had a substantial basis for concluding that probable cause existed to support the issuance of the search warrant; and (2) whether the statements made by Defendant while in custody at the Cumberland County Jail should be suppressed. *See* Defendant's Brief in Support of Motion to Suppress Evidence ("Defendant's Brief") (Docket No. 11) at 2; Government's Supplemental Memorandum in Support of its Objection to Defendant's Motion to Suppress ("Government's Supp. Memo.") (Docket No. 12) at 1. The parties agreed that no evidentiary hearing was necessary for the Court's resolution of these two issues. For the reasons set forth below, the Court will deny Defendant's motion in part and grant Defendant's motion in part.

## I. BACKGROUND

On December 3, 1997, a Cumberland County (Maine) grand jury returned a two-count indictment charging Defendant with trafficking in cocaine. The Maine Superior Court subsequently issued a warrant for Defendant's arrest based upon the indictment. On December 29, 1997, John Dumas ("Agent Dumas"), a Special Agent of the State of Maine Drug Enforcement Agency, submitted an affidavit in support of a search warrant for apartment 1006 at 401 Cumberland Ave, Portland. The affidavit targeted evidence including documents, records, and sums of money related to drug trafficking. Agent Dumas indicated that he was currently conducting an investigation into the possible trafficking, furnishing and/or possession of scheduled drugs by Defendant. The following is a narrative of the facts alleged in Agent Dumas's affidavit. *See* Government's Objection to Defendant's Motion to Suppress and Incorporated Memorandum ("Government's Objection") (Docket No. 9) Ex. B.

On September 22, 1997, a cooperating individual ("CI") reported that he/she had been buying cocaine from a Dominican male known to CI as "John" since the summer of 1985. CI did not believe this to be the man's real name. CI indicated that he/she originally had to travel to New Hampshire or Massachusetts to purchase cocaine from John, but that John had moved to Portland in the beginning of the summer of 1997, where CI continued to purchase cocaine from him. Agent Dumas indicated that several investigative leads led him to conclude that the man known to CI as John was actually Defendant. Agent Dumas later showed a picture of Defendant to CI, and CI confirmed that the man in the photograph was the man CI knew

as John, from whom CI had made two controlled purchases of cocaine.

The first of these two controlled purchases apparently was not observed by Agent Dumas, but his affidavit reported that Defendant had arrived at the arranged location in a green Toyota Forerunner with a Massachusetts license plate and had sold cocaine to CI in his vehicle. During the second controlled purchase, Agent Dumas transported CI to the agreed location, observed Defendant and CI exchange items, and took possession of the cocaine turned over to him by CI following the purchase. After the second controlled purchase, Defendant "refused to sell CI any more drugs and ... changed his cellular phone number and pager number." CI informed Agent Dumas that Defendant had spoken of investing his profits from drug sales in a "legitimate" business and that he planned to open a cigar store somewhere. Defendant had told CI that there was "more money in cigars." On December 5, 1997, Agent Dumas observed Defendant apparently working at the Fortune Cigar Shop in Kennebunkport. The Kennebunkport Chamber of Commerce confirmed that the Fortune Cigar Shop was owned by Defendant, who had joined the Chamber of Commerce in late November.

On November 16, 1997, a cooperating defendant ("CD"), arrested on cocaine trafficking charges, told Agent Dumas that he/she knew a Dominican male from Lawrence, Massachusetts who calls himself "John" and lives in Portland on Cumberland Avenue in the "really tall apartment building." CD refused to cooperate against John because, according to CD, John has many connections in the drug trade who would be capable of harming CD and/or his/her family. CD told Agent Dumas that Defendant had discussed the possible purchase of one kilo of cocaine from CD during the late summer or early fall of 1997. From the assistant manager of the building, Agent Dumas learned that Defendant resided in apartment 1006 of the sixteen-story building located at 401 Cumberland Avenue.

Agent Dumas included a paragraph setting forth his training and experience as a law enforcement officer and expressed his opinion, based upon this training and experience, that drug traffickers commonly keep documents, records, and sums of money related to their drug-trafficking activities at their residences. In an apparent effort to bolster the force of his opinion, Agent Dumas included quotations of and citations to case law to support his proposition and, presumably, to demonstrate that other courts have relied on such an inference. Agent Dumas also stated that "[n]otwithstanding [his] good faith belief, based upon [his] experience, education [,] training and/or study and case law, that such evidence of drug trafficking will be found at the premises, [he] defers to the magistrate's evaluation of these issues in determining whether to issue this search warrant upon a finding of probable cause."

On December 29, 1997, the Honorable Joyce Wheeler of the Maine District Court issued a warrant authorizing the search of apartment 1006 at 401 Cumberland Avenue for documents, records, and sums of money relating to drug trafficking. Government's Objection, Ex. A. According to Defendant, the following events occurred:

At approximately 7:20 p.m. on Monday, December 29, 1997, Agents Dumas, Vogel and Stepnick executed an arrest and search warrant a [sic] the apartment of Mr. Feliz. After placing Mr. Feliz under arrest, the [sic] Agent Dumas informed Mr. Feliz that he had a search warrant and in any event they would be conducting a full search of the apartment. Without disclosing that the warrant did not include drugs or weapons, Agent Dumas asked Mr. Feliz if he had any drugs or weapons in the apartment [sic] he could let him know in advance. After some thought, Mr. Feliz pointed out the location of a blue GAP shopping bag that contained a quantity of cocaine.

Later that same day, Agent Stepnick interviewed Mr. Feliz at the Cumberland County jail. It is not contested that Agent Stepnick read Mr. Feliz his Miranda rights at that time prior to the interview and that Mr. Feliz agreed to talk with the agent. After three questions, Mr. Feliz said that he no longer felt comfortable and would prefer to wait to talk to an attorney.

Agent Stepnick honored the invocation and there was no further questioning. Defendant's Brief at 13.[1] Defendant now asks the Court to suppress the evidence seized during the search of his apartment and the statements made during his custody at Cumberland County Jail. The Court will address in turn the two legal issues identified by the parties: (1) whether the issuing judge had a substantial basis for concluding that probable cause existed to support the search warrant; and (2) whether the statements made by Defendant while in custody at the Cumberland County Jail should be suppressed.

## II. THE SEARCH WARRANT

■ The Court of Appeals for the First Circuit has indicated that a warrant application must show probable cause as to two elements: (1) the commission element; and (2) the nexus element.[2] *See United States v. Zayas–Diaz*, 95 F.3d 105, 110–11 (1st Cir. 1996). In making the probable-cause determination, the issuing judge usually considers only the facts set forth in the supporting affidavit which accompanies the warrant application. *See id.* Applying a totality-of-the-circumstances standard, the issuing judge's task "is simply to make a practical, common-sense decision whether .... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). In assessing whether a substantial basis existed for finding probable cause to issue the warrant, the Court reviews the issuing judge's determination of probable cause with great deference. *Id.* at 236, 103 S.Ct. 2317; *see also Zayas–Diaz*, 95 F.3d at 111. "[T]he supporting affidavit must be viewed in a practical, 'common sense' fashion, and [the reviewing court] must accord considerable deference to reasonable inferences the [issuing judge] may

have drawn from the attested facts." *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir.1992) (citations omitted).

■ Under *United States v. Leon*, 468 U.S. 897, 925, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), a reviewing court may bypass the probable-cause question and proceed directly to the question of whether the evidence should be admitted under the good-faith exception announced in *Leon.* The decision of whether to address the probable-cause issue is left to the trial court's discretion. *Id.* Ordinarily, "[p]rinciples of judicial restraint and precedent dictate that ... [the court] should not reach the probable cause issue if a decision on the admissibility of the evidence under the good-faith exception of Leon will resolve the matter." *United States v. Craig*, 861 F.2d 818, 820 (5th Cir.1988). However, the exception to this general rule occurs in instances "in which the resolution of a 'novel question of law ... is necessary to guide future action by law enforcement officers and magistrates.'" *Id.* (citing *Illinois v. Gates*, 462 U.S. at 264, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)). Because only one other court in this circuit has addressed the precise issue presented by the probable-cause determination in the instant case, *see United States v. Rosario*, 918 F.Supp. 524 (D.R.I.1996), the Court will address the probable-cause issue before proceeding to the *Leon* analysis.

### A. Probable Cause

■ Defendant asserts that the issuing judge did not have a substantial basis to find probable cause and attacks the supporting affidavit on several grounds, the most important of which is his assertion that the affidavit fails to establish a nexus between the targeted evidence of the probable criminal activity described in the search warrant and Defendant's apartment.[3] Defendant argues

---

1. There is no dispute that Agent Dumas failed to inform Defendant of his *Miranda* rights at the time of his arrest.

2. The commission element requires a showing that probable cause exists to believe "that a particular person has committed a crime." *United States v. Zayas–Diaz*, 95 F.3d 105, 110–11 (1st Cir.1996). The nexus element requires a showing that there is probable cause to believe "that

enumerated evidence relevant to the probable criminality likely is located at the place to be searched." *Id.*

3. Defendant's other grounds of attack are: (1) staleness of the information relied upon by the issuing judge; (2) a lack of indicia of reliability as to either cooperating individual mentioned in the supporting affidavit, especially as to the second informant known as "CD;" and (3) the case

that the affidavit fails to allege facts which connect Defendant's apartment to any drug activity. The Government agrees with Defendant that, in concluding that the nexus element was satisfied, the issuing judge essentially relied on the following assertions made by the affiant: [4]

> From my experience, education, training and/or study, I know it to be quite common for those involved in the illegal trafficking/furnishing of scheduled drugs to possess, maintain and keep with them, near them, and/or in their residences business records and journals relating to the trafficking and/or furnishing of scheduled drugs. In particular, I know that, where, as here, an individual is demonstrated to be trafficking in drugs, it is not uncommon for there to be evidence of their [sic] drug trafficking activities, such as drug records, telephone numbers of suppliers and customers, drug trafficking paraphernalia, drug proceeds and/or evidence of transfer, expenditures or investment of drug proceeds kept at the trafficker's residence.

Government's Objection, Ex. B ¶ V(A).[5] Defendant asserts that permitting such reliance virtually eliminates the requirement of the nexus element when drug activity is involved, because no facts specific to this particular Defendant are alleged. Rather, this portion of the affidavit sets forth merely a generalization about the behavior of all drug traffickers. The Government responds that "a court may properly consider the police officer's training and experience at interpreting facts which might to the layman look innocuous." Government's Supp. Memo. at 4.

■ The question of whether the opinion of a law enforcement officer, standing alone, may provide the necessary nexus between the place to be searched and the evidence relevant to the probable criminal activity has been answered differently by federal courts. *See, e.g., United States v. Schultz,* 14 F.3d 1093, 1097 (6th Cir.1994) (holding that although the training and experience of a law enforcement officer may be considered in the determination of probable cause, "it cannot substitute for the lack of evidentiary nexus"); *United States v. Rios,* 881 F.Supp. 772, 775 (D.Conn.1995) (holding that an affidavit containing a law enforcement officer's expert opinion but no facts to support an inference that evidence of the defendant's criminal activity would be found at his home did not provide a substantial basis for a finding of probable cause); *United States v. Gomez,* 652 F.Supp. 461, 463 (E.D.N.Y.1987) (holding that although the issuing judge is entitled to "consider and credit" the expert opinion of a law enforcement officer, "it does not alone provide probable cause to search"); *but see, e.g., United States v. Thomas,* 989 F.2d 1252, 1254 (D.C.Cir.1993) (finding probable cause to search the defendant's home based on his involvement in drug-dealing activities and law enforcement officer's opinion that drug dealers frequently keep evidence of their activities in their houses). This Court concludes that principles established by our Fourth Amendment jurisprudence require some showing of facts particular to *this* Defendant to warrant a search of his home. Because the supporting affidavit failed to offer any such facts, the Court determines that the issuing judge lacked a substantial basis to find probable cause to issue the search warrant.

■ Establishing probable cause to believe that an individual has engaged in criminal activity does not automatically lead to the conclusion that probable cause exists to

---

law cited in the supporting affidavit allegedly designed to convince the judge to issue the warrant despite clear shortcomings. Defendant's Brief at 6. Because the Court concludes that Defendant's first argument is dispositive of the issue of probable cause, the Court will address Defendant's other complaints in the context of its *Leon* analysis.

4. Agent Dumas made similar assertions about the habits of drug traffickers with regard to sums of money related to their drug trafficking activities. Government's Objection, Ex. B ¶ VI(B).

5. The previous paragraph of Agent Dumas's affidavit sets forth his training and experience. Government's Objection, Ex. B ¶ IV. Agent Dumas indicated that he had a little over four years of experience in law enforcement and had been assigned to the Maine Drug Enforcement Agency for approximately twenty months. He further asserted that he had "assisted in the execution of successful drug-related search warrants, and [had] authored several successful drug-related search warrants."

search that individual's home. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978); *see also United States v. Savoca*, 739 F.2d 220, 225 (6th Cir.1984) ("[T]he existence of probable cause to arrest will not necessarily establish probable cause to search."). The Government's position, permitting law enforcement officers' general opinions about the behavior of drug traffickers in the abstract to satisfy the nexus requirement, would essentially eviscerate these principles.

Other courts have agreed that a finding of probable cause to search a defendant's residence requires more than a law enforcement officer's opinion that drug traffickers commonly keep certain evidence in their homes. In *United States v. Gomez*, the court held that if "there is nothing to connect the illegal activity with the arrested person's apartment, to issue a warrant based solely on the agent's expert opinion would be to license virtually automatic searches of residences of persons arrested for narcotics offenses." *Gomez*, 652 F.Supp. at 463. Likewise, in *United States v. Rosario*, the court concluded that "[t]o permit a search warrant based solely upon the self-avowed expertise of a law-enforcement agent, without any other factual nexus to the subject property, would be an open invitation to vague warrants authorizing virtually automatic searches of any property used by a criminal suspect." *Rosario*, 918 F.Supp. at 531.

Although this is a novel question for this district, the Court has previously expressed similar concerns relating to the nexus element of the probable-cause determination. In *United States v. Kenney*, 595 F.Supp. 1453, 1461 (D.Me.1984), the Court noted that "[a]lthough there need not be absolute proof that an alleged drug dealer keeps his drugs, records, etc. at his home, there must be some indication that the home is implicated to warrant the major intrusion of a search." In *Kenney*, the Court concluded that "[w]ithout more than merely the statement in the affidavit that [the defendant] has committed a drug offense, the · Court cannot find that there was adequate probable cause to support the issuance of the warrant to search his house." [6] *Id.* The Court views its conclusion in the instant case—that more of a factual predicate than a law enforcement officer's expert opinion is required to establish the necessary nexus for a finding of probable cause to search a defendant's home—as a logical progression of its earlier conclusions in *Kenney*.[7]

The Court's analysis does not end with its conclusion that the issuing judge lacked a substantial basis for determining that probable cause existed to support the search warrant. The Court must now assess whether the *Leon* good-faith exception to the exclusionary rule applies to this situation. *See Leon*, 468 U.S. at 922, 104 S.Ct. 3405.

### B. The *Leon* Good–Faith Exception

Even if a search was not properly supported by probable cause, the evidence yielded may still escape suppression under the *Leon* good-faith exception to the exclu-

---

6. The Court listed several ways in which a factual connection between the evidence sought and the place to be searched could be established, for example, if a defendant was seen at his house just prior to a drug sale or if the alleged transaction took place near the defendant's home. *See United States v. Kenney*, 595 F.Supp. 1453, 1461 (D.Me.1984). Agent Dumas's affidavit provides no such facts to link Defendant's home with his alleged drug-dealing activities.

7. The Court agrees with the Government in its assertion that the issuing judge may properly consider the law enforcement officer's training and expertise at interpreting facts which may seem innocuous to a layperson. However, this assertion presupposes the inclusion of facts in the affidavit for the law enforcement officer to interpret. In the instant affidavit, there were no facts regarding a nexus between the probable criminal activity and the place to be searched. The only facts for Agent Dumas to interpret were those supporting the determination of probable cause as to criminal activity. However, as the Court has explained, the determination that probable cause exists to suspect a defendant of criminal activity does not automatically give rise to probable cause to search his home. *See Zurcher v. Stanford Daily*, 436 U.S. 547, 556, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978).

sionary rule, which permits the admission of such evidence "when an officer acting with objective good faith has obtained a search warrant from a judge or magistrate and acted within its scope." *Leon*, 468 U.S. at 920, 104 S.Ct. 3405. "Since no deterrent purpose is served by sanctioning 'objectively reasonable' law enforcement conduct, ... the 'extreme sanction' of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an 'objectively reasonable' manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective...." *Zayas–Diaz*, 95 F.3d at 113 (citations omitted). Under *Leon*, suppression is appropriate in four instances: (1) "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth;" (2) "where the issuing magistrate wholly abandoned his judicial role;" (3) if the "warrant [is] based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable;'" and (4) if the "warrant [is] so facially deficient ... that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 923, 104 S.Ct. 3405 (citations omitted).

Defendant essentially argues that the *Leon* good-faith exception should not apply to the instant search for the following three reasons: (1) Agent Dumas did not act in good faith in seeking or executing the search warrant; (2) Agent Dumas's reliance upon the search warrant was not objectively reasonable; and (3) the issuing judge acted as a "rubber stamp" in finding probable cause to issue the search warrant. The Court will address each of Defendant's objections in turn.

▮▮▮ Defendant initially argues that Agent Dumas's execution of the search warrant cannot be viewed as an act of good faith

because the warrant was obtained on the basis of a "bare bones" affidavit. Defendant points to *Leon*, in which the Supreme Court said "[n]othing in our opinion suggests, for example, that an officer could obtain a warrant on the basis of a 'bare bones' affidavit and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search." [8] *Leon*, 468 U.S. at 923 n. 24, 104 S.Ct. 3405. However, the Court is not persuaded that Agent Dumas's affidavit is properly characterized as a bare bones affidavit. "An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge, is a 'bare bones' affidavit." *United States v. Weaver*, 99 F.3d 1372, 1378 (6th Cir.1996). As the Court will explain below, Agent Dumas's affidavit contains sufficient factual information to escape being labeled a bare bones affidavit.

Defendant directs the Court's attention to *United States v. Wilhelm*, 80 F.3d 116 (4th Cir.1996), to bolster his position that the *Leon* good-faith exception does not apply to the instant search. In *Wilhelm*, the court held that the good-faith exception did not apply because of the bare bones nature of the supporting affidavit, which contained only facts derived from an unnamed informant, with no independent corroboration of the report or indication of the informant's truthfulness or reliability beyond conclusory descriptions.[9] *Wilhelm*, 80 F.3d at 120–21. To the contrary, Agent Dumas's affidavit provides significantly more reliable factual information. The two informants, CI and CD, corroborate each other's reports in several respects, and Agent Dumas himself was able to verify the information provided on several significant points, such as Defendant's address and his drug-dealing activities, through investigation and personal observation.

---

8. Likewise, it stands to reason that a law enforcement officer will not be acting in good faith if he executes a search warrant which he himself obtained on the basis of a bare bones affidavit.

9. The Wilhelm court also found that the good-faith exception should not apply because "the state magistrate could not have acted as other

than a 'rubber stamp' in approving such an affidavit." *United States v. Wilhelm*, 80 F.3d 116, 121 (4th Cir.1996). As the Court will explain *infra*, the issuing judge did not act as a "rubber stamp" in relying upon Agent Dumas's affidavit to find probable cause to issue the instant search warrant.

■ Defendant also points to Agent Dumas's inclusion of case law in his affidavit as further evidence that he did not act in good faith in seeking or executing the search warrant. As the Court has explained, however, the issue for which Agent Dumas included case law is undecided in this circuit and is the subject of differing opinions among other federal courts. Although the inclusion of the case law was inappropriate, the Court does not view it as evidence of bad faith on Agent Dumas's part.[10]

■ Second, Defendant asserts Agent Dumas's reliance upon the search warrant was not objectively reasonable. Defendant contends the affidavit contained stale information upon which no law enforcement officer could reasonably rely. He makes this assertion because the affidavit provided information about drug-dealing activities conducted approximately three months prior to the issuance of the search warrant. However, "courts confronting suppression motions do not measure the timeliness of collected information mechanistically, merely counting the number of days elapsed." *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir.1996). Rather, the "likely endurance of the information" is to be gauged by an assessment of the following factors: "the nature of the information, the nature and characteristics of the supposed criminal activity, the nature and characteristics of the place to be searched, [and] the nature of the items delineated in the warrant." *Id.* In light of these factors, especially the nature of evidence sought (documents, records, and sums of money), the Court concludes that it was not unreasonable for Agent Dumas and his colleagues to rely upon the information contained in the affidavit.[11]

Defendant also asserts that the affidavit lacks sufficient indicia of the credibility and reliability of the two informants, CI and CD. The Court of Appeals for the First Circuit has said "an informant's tales need not invariably be buttressed by extensive encomia to his veracity or detailed discussions of the source of his knowledge." *Id.* at 566. Agent Dumas's affidavit contains sufficient information to support the credibility of the informants' reports. The two informants provided information which corroborates their respective stories as to Defendant's alias and drug-dealing activities. Agent Dumas was able to provide corroboration as to other elements of the informants' reports through his own investigation and observation. It was not objectively unreasonable for either Agent Dumas (or the issuing judge) to rely upon the information contained in the affidavit, including the information provided by the two informants.

■ Finally, Defendant asserts that the issuing judge acted as a "rubber stamp" in issuing the warrant and that, in doing so, she abdicated her judicial role. The Court determines that on the basis of the information provided, the issuing judge's decision to issue the search warrant was not a departure from her judicial role. The primary concern presented by Agent Dumas's affidavit is its failure to allege any facts linking this particular Defendant's probable criminal activity to the place to be searched.[12] As other courts have differed in opinion as to whether the nexus element can be satisfied by the expert opinion of the law enforcement affiant and the Court of Appeals for the First Circuit has not had the opportunity to address the issue, the issuing judge's determination of probable

10. To the extent that Defendant can be understood to argue that the inclusion of case law constitutes knowingly or recklessly false conduct on Agent Dumas's part, the Court rejects this argument. While the inclusion of case law was inappropriate, the Court does not believe it implicates the first exception to the *Leon* good-faith rule.

11. Defendant's assertion that the information contained in the affidavit would have caused a trained law enforcement officer to conclude that Defendant had "gone straight" excludes the possibility of the inference that Defendant also could have continued his drug-trafficking activities in conjunction with his cigar business. This was not an unreasonable inference for Agent Dumas, the issuing judge, or the other law enforcement officers executing the warrant to have drawn.

12. Defendant's other objections to the affidavit, including staleness and lack of indicia of credibility and veracity of the informants, do not raise the issuing judge's decision to the level of "rubber stamping."

cause does not represent an abandonment of her judicial role.

For the reasons stated above, the Court determines that *Leon*'s good-faith exception applies to the search in this instance and will deny Defendant's motion to suppress the evidence seized during the search.

## III. DEFENDANT'S JAILHOUSE STATEMENTS

 Defendant argues that the failure to inform him of his *Miranda* rights at the time of his arrest deprived him of his right to counsel under the Sixth Amendment when he was questioned at his apartment and, thus, his jailhouse statements should be suppressed as the fruit of this violation of his Sixth Amendment right to counsel.[13] The Government responds that Defendant's jailhouse statements were made following a knowing and intelligent waiver of his *Miranda* rights and, thus, are admissible. The Court concludes that the fruit of the poisonous tree doctrine requires the suppression of Defendant's jailhouse statements.

The Supreme Court has held that "once formal criminal proceedings begin, the Sixth Amendment renders inadmissable in the prosecution's case in chief statements 'deliberately elicited' from a defendant without an express waiver of the right to counsel." *Michigan v. Harvey*, 494 U.S. 344, 348, 110 S.Ct. 1176, 108 L.Ed.2d 293 (1990) (citations omitted). When a defendant waives his right to counsel after receiving *Miranda* warnings, "that will generally suffice to establish a knowing and intelligent waiver of the Sixth Amendment right to counsel for purposes of postindictment questioning." *Id.* (citation omitted).

In the instant case, Agent Dumas questioned Defendant after his Sixth Amendment right to counsel had attached without informing him of his *Miranda* rights before doing so.[14] Thus, Defendant did not waive his right to counsel in making his initial statements during the search at his apartment. The Court must now analyze whether Defendant's subsequent jailhouse statements must be suppressed as the fruit of this earlier violation of his Sixth Amendment right to counsel.

The fruit of the poisonous tree doctrine, developed in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), has been applied to violations of the Sixth Amendment as well as to those of the Fourth Amendment. *See United States v. Wade*, 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). In *Wong Sun*, the Supreme Court held that statements made subsequent to an unlawful search are inadmissable if they were obtained through exploitation of the illegality of the search. *Wong Sun*, 371 U.S. at 488, 83 S.Ct. 407. The Court declined to label all evidence acquired in the wake of a Fourth Amendment violation as "fruit of the poisonous tree," but, rather, said "the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" *Id.* (quoting Maguire, Evidence of Guilt, 221 (1959)). The Supreme Court has instructed that the same question is appropriate in the context of the Sixth Amendment. *See Wade*, 388 U.S. at 241, 87 S.Ct. 1926.

In the Fourth Amendment context, the Supreme Court has declined to hold as a per

---

**13.** Defendant makes two additional arguments in favor of suppression. First, he asserts that the search of his apartment was conducted without probable cause, thereby rendering his jailhouse statements "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Second, he claims that Agent Dumas's failure to inform Defendant of his *Miranda* rights at the time of his arrest taints his post-*Miranda* statements and requires their suppression. Because the Court concludes that the statements must be sup-

pressed on the basis of Defendant's Sixth Amendment right to counsel, it is unnecessary for the Court to reach Defendant's additional arguments.

**14.** At the time of his arrest, Defendant had been indicted by a Cumberland County grand jury. The Sixth Amendment right to counsel attaches when a defendant has been indicted. *See Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964).

se rule that the administering of *Miranda* warnings breaks the causal connection between the earlier illegality and the subsequent statements. *Brown v. Illinois,* 422 U.S. 590, 603, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975). Rather, "Wong Sun requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" *Id.* at 602, 95 S.Ct. 2254 (quoting *Wong Sun,* 371 U.S. at 486, 83 S.Ct. 407). The Court instructed that the determination of whether the subsequent statements were obtained by exploitation of the earlier illegality requires consideration of several factors, including whether *Miranda* warnings were administered, the temporal proximity of the illegal activity and the subsequent statements, the presence of intervening circumstances, and the "flagrancy and purpose of the official misconduct." *Id.* at 603–04, 95 S.Ct. 2254. The burden of showing admissibility rests upon the Government. *Id.* at 604, 95 S.Ct. 2254.

In arguing that Defendant's jailhouse statements were not obtained through the exploitation of the earlier Sixth Amendment violation, the Government focuses upon the fact that *Miranda* warnings were administered prior to Defendant's jailhouse statements. *See* Government's Second Supplemental Memorandum (Docket No. 14) at 2. This argument might be persuasive if the earlier illegality were merely a violation of the prophylactic *Miranda* rule. *See Oregon v. Elstad,* 470 U.S. 298, 308, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) (holding that an earlier breach of the *Miranda* procedures does not require exclusion of subsequent warned statements as long as the original statements were not obtained through coercion). However, in the instant case, the earlier illegality consists of a violation of a core constitutional right. *See, e.g., New York v. Quarles,* 467 U.S. 649, 671 n. 4, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984) (O'Connor, J., concurring in part and dissenting in part) (discussing the distinction between violations of constitutional rights and violations of the prophylactic standards of *Miranda* in the context of the fruit of the poisonous tree doctrine); *Michigan v. Tucker,* 417 U.S. 433, 445–46, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974) (distinguishing between the fruits of a violation of defendant's

Fourth Amendment rights and a violation of the *Miranda* rule). As such, the principles set forth in *Wong Sun* and *Brown* are applicable.

The Government has not offered, nor can the Court discern from the record, any additional circumstances beyond the giving of the *Miranda* warnings to support a conclusion that the means by which the subsequent jailhouse statements were obtained were sufficiently distinguishable from the earlier violation. The Court views the entire situation, commencing with Defendant's arrest and the search of his apartment and concluding with his request for an attorney after speaking with Agent Stepnick, as one course of events. There was no intervening event or meaningful gap in time between the two sets of statements. Under these circumstances, including the clear violation of Defendant's Sixth Amendment right to counsel, the subsequent administering of Miranda warnings was insufficient to purge the taint. Based upon the information available, the Court concludes that Defendant's jailhouse statements must be suppressed as the fruit of the earlier violation of Defendant's Sixth Amendment right to counsel.

### IV. CONCLUSION

Accordingly, it is **ORDERED** that Defendant's Motion to Suppress be, and it is hereby, **DENIED** as to the evidence obtained in the search of his apartment and **GRANTED** as to his jailhouse statements.